IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**FREDRICK D. EASTER**                                                                 **PLAINTIFF**

v.                              Civil No.: 6:08-cv-06099

**SHERIFF LARRY SANDERS** *et al.*                                               **DEFENDANTS**

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Fredrick Easter ("Easter" or "Plaintiff" herein), currently an inmate in the Garland County Detention Center in Hot Springs, Arkansas, filed this civil rights action under 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) (2005), the Honorable Robert T. Dawson, United States District Judge, referred this case the undersigned for the purpose of making a report and recommendation.

An evidentiary hearing was held before the undersigned on September 14, 2010. The undersigned issues the following Report and Recommendation based upon the evidence presented at that hearing.

**I.      Background and Evidence Presented**

Plaintiff presents two claims in this action – one, that Defendants failed to protect him, and two, that he was denied medical care. Both of these claims stem from an incident occurring at the Garland County Detention Center on or about October 11, 2008.

At the evidentiary hearing testimony was presented from the following witnesses in the following order: (1) Fredrick Easter, Plaintiff; (2) James Hill; (3) Mel Steed; (4) Linda Rowe; (5) Jeremy Hedrick; (6) Shane Tatum; (7) Kenny Ford; and (8) Michael Rima, Jr.

In addition to the testimony of witnesses, the following exhibits were also admitted.

Defendants admitted exhibits numbered one through fourteen into evidence, all with no objection from the Plaintiff. The record was left open after the evidentiary hearing for the receipt of the "jail cards" of the inmates who were housed in block 1B during the time of the incident. These cards were received and marked as Plaintiff's exhibit one.

Below is a summary of the testimony presented by each witness:

    A.    <u>Fredrick Easter</u>

Easter is currently twenty-one years of age, and is incarcerated at the Garland County Detention Center. Easter testified he should have been on lockdown on October 11, 2008, but instead was moved to an open barracks along with his cellmate, James Hill ("Hill"). The new barracks contained only white inmates, some of who were affiliated with the Aryan Nation prison gang, and both Easter and Hill are African-American. Easter and Hill were assaulted within ten minutes of moving into the new pod.

The other inmates indicated to Easter and Hill that the jail guards told them to assault the two African-American inmates. Easter beat on the door after the assault and the guards came and took him to a holding cell where he remained until the midnight shift came on duty. Easter asked for medical care but was not treated.

Easter suffered a large bruise to the side of his head. Named Defendants Officers Ford, Tatum, and Rima placed the Plaintiff into the cell with the white inmates. Officer Rima told Easter and Hill which cell was theirs.

Defendants did not let Easter see the nurse when he asked, and would not give him a medical complaint. Easter sat in a holding cell until the next shift, and then was given a medical complaint. Easter was bleeding from his nose, but suffered what he described as "nothing major." While in the

holding cell, Defendant Rowe came and spoke with him, but he could not remember what she said. Easter saw the nurse the next day.

Although Easter filed subsequent medical requests, he did not mention his injuries in those documents. On September 15, 2008, Easter reported painful teeth and needed to see a dentist. A second request regarding dental care was also filed on September 15, 2008. On September 24, 2008, Easter asked for an oral surgeon in a medical request. On September 29, 2008 Easter complained the medication was not helping him, and he wanted to go back to his original medication. On October 7, 2008, Easter complained of problems with his wrists and teeth.

The incident occurred on October 11, 2008. Only two medical requests followed the incident. The first was filed on October 19, 2008. Easter stated in that request that his teeth hurt and he could not eat or sleep. On October 21, Easter again complained about his teeth and requested to see a dentist. There were no other medical requests.

Easter was incarcerated in the Garland County Detention Center because he had been arrested in May of 2008. Easter had a prior conviction of possession of a controlled substance. He remained at the Garland County Detention Center until November 12, 2008.

Easter and Hill were placed in pod 1D, which was designated for convicted felons. This pod consists of separate rooms with locks on the doors. On more than one occasion, Easter jammed the locks in 1D. This happened at least twice before Easter and Hill were moved due to the damage to the locks. They were moved to 1B which is a pod reserved for inmates considered to be "troublemakers." In 1B all of the locks on the doors were damaged in October of 2008, the time of the incident, and the inmates housed there could move around freely.

Easter stated he and Hill did not yell anything at the white inmates, but the white inmates

yelled put for the jailers to "put the niggers in here." When Easter arrived to his new cell, he did not attempt to close the door. He was not afraid in the cell and did not expect the confrontation to get physical. In fact, when Easter arrived to the cell, he and Hill began playing cards. Inmates often would "mouth off" to one another, but such "jail talk" was common and did not indicate violence was imminent. Easter was surprised when the white inmates came in and fought with him, he never had problems with these inmates prior to the incident. Easter did not indicate to the guards he should not be placed with the white inmates.

When the other inmates entered the cell, Easter and Hill fought back, but the fight only lasted a few minutes. Robert Black, one of the white inmates, told Easter and Hill to "thank the guards."

Easter testified that Sanders and Steed were not present at the incident, and neither had any direct involvement in the incident. Defendant Ford placed Easter into cell 1B and also slammed Easter into a wall and busted his lip.[1] Defendant Tatum helped to escort Easter to cell 1B, and threatened to place Easter back into the cell after the incident. Defendant Rima placed Easter in 1B along with Ford and Tatum, and was present in the hallway after the incident.

B.   James Hill

James Hill is a twenty-four year old resident of Little Rock, Arkansas. He testified that on October 11, 2008 he was cellmates with Easter. On that date, Easter and Hill were moved from the cell due to lock damage. Easter had jammed the locks, but both Hill and Easter were charged with destruction of county property.

Hill and Easter were taken to 1B, and the inmates can not see in or out of 1B, but on arrival

---

[1] Plaintiff did not mention Ford applying such force until the time of hearing. Plaintiff has not stated he is seeking an excessive force claim against Defendant Ford. However, there was nothing in the evidence presented at the hearing to suggest unreasonably excessive force was used on Plaintiff during the incident.

-4-

the white inmates were yelling for the guards to bring in the "niggers." Hill asked why they were brought to an open cell block since he and Easter were on lockdown. Hill and Easter went to their cell and began playing cards when they heard racial slurs and comments such as "there is going to be a hanging" and to "get sheets."

Hill then stated he and Easter were attacked, and tried to fight back. After the fight was over, they went to door and tried to get help from guards. However, they both felt the guards set up the fight. Hill and Easter were angry, and told the guards it was intentional and that they would get an attorney involved. Tatum told them both to be quiet or they would be placed back into the cell.

Easter stated to the guards that handcuffs were not necessary to escort them back to the holding cell, because he and Hill just wanted to leave. Easter was then slammed to the floor for resisting an officer.

Hill was in the holding cell for thirty to forty minutes with blood on his face, busted blood vessels, and a sprained wrist, among other injuries, before he was even checked on. Defendant Rowe came and talked with Hill and tried to deny it happened. She stated Hill and Easter were fighting each other, and stated that other inmates were not hurt. Hill indicated the "whole thing" seemed "set-up." Rowe asked about going to the doctor and Hill stated he did not need to go because he did not want to go with anyone from that shift out of fear.

Hill went to the Emergency Room the next day and X-rays were taken of his swollen hands. He was prescribed medication, which the jail provided to him, and was sent back to the jail. Hill wore a brace until he was released, but was in no other fights and remained isolated from the white inmates. Hill indicated he suffered some mental issues from the altercation in the jail, but he has not sought psychiatric care.

Hill had no other problems with the inmates in 1B, he did not ask the guards to refrain from putting him in that pod. On the street, Hill had no issues with those inmates. Hill and Easter had no reason to fear their safety, and Hill was surprised when the other inmates attacked him and Easter. Hill stated that "jailhouse talk" goes on everyday, including the exchange of verbal taunts. However, before Easter and Hill entered the cell block, the white inmates knew they were coming. Hill knew the other inmates were affiliated with white supremacists from the inmates' tattoos. Hill did not go to guards when saw the tattoos because he felt the action was futile.

Hill's first conviction was for possession of a controlled substance in 2005. His most recent conviction was for hot checks in 2009. Hill was incarcerated in October of 2008 for possession with intent to deliver.

    C.    Captain Steed

Captain Steed works at the Garland County Detention Center, and has been the jail administrator for six years. He is familiar with the policies and procedures of Garland County. Steed stated the county works to maintain a safe environment for detainees.

If the staff is put on notice of potential issue between inmates the response is to separate those inmates. The county will also separate inmates by classification, for example, felony and misdemeanor inmates are separated.

To monitor the facility, there is an audio system where inmates can be listened to if necessary or if the staff believes something is going on which should be monitored. There is also video monitoring available throughout the facility. The staff will complete regular jail checks, often one hour apart, but the frequency can be up to fifteen minutes apart. Staff is also able to visually monitor the facility from guard station locations. If there is notice of a potential issue, then inmates can be

moved. Steed did not know of Easter and Hill other than as inmates. He knew of no issues either had with other inmates in the facility.

Defendants' exhibit one was described by Steed to be a booking card for Easter. The card reflected that Easter was arrested on May 27, 2008 and released on November 12, 2008 to the Arkansas Department of Correction ("ADC"). Easter was sentenced on July 15, 2008.

Defendants' exhibit two was described by Steed as a county jail information form, which is provided to the ADC from a county jail, such as Garland County. The ADC asks for rating of performance for proper placement of an inmate into their facilities. The form for Easter stated he verbally abused jail staff, acted out and failed to obey orders.

Defendants' exhibit three was described by Steed to be jail detainee grievance forms. Easter admitted he tore up the locks and placed tissue in a door.

Steed further stated Easter had problems consistently throughout his stay in the Garland County Detention Center. Steed identified Defendants' exhibit five as a record of disciplinary action on October 7, 2008, consisting of fifteen days of lockdown and loss of privileges due to damage of property. Defendants' exhibit six shows Plaintiff was disciplined a second time for tearing up a door.

Steed testified the Garland County Detention Center has three felony blocks. Easter was originally housed in 1D. However, when an inmate causes or creates a problem, that inmate is moved to 1B, which is the disciplinary block. Due to the destruction of property by Easter, he was moved from 1D to 1B.

Steed further stated that at various times, inmates of all races were housed in cell 1B, and another African-American inmate was in cell a few days before Easter was placed there.

Defendants' exhibit four was identified by Steed as an inmate medication ledger, which is sued

to record medication dispensed to inmates. Steed further stated Easter received needed medical care while at Garland County, and was not denied any prescription he was prescribed.

Steed identified Defendants' exhibit seven as the medical care requests by Easter. Primarily, Easter complained of dental issues. Page ten of exhibit seven is the first medical care request submitted after the incident, and it only concerned tooth pain.

Additionally, Rowe was in charge of inmate safety, and Steed would contact her about these issues. Rowe could have called her lieutenant, who was named McMurray, or talked with Steed if any issues arose. If Steed could not resolve the issue, he would speak with the Sheriff and possibly the county attorney.

Steed also stated the jail documents any tattoos, and if they are tattoos known to relate to a gang, such as a white supremacist group, the information is given to the Drug Task Force, not to him.

    D.    <u>Linda Rowe</u>

Linda Rowe ("Rowe") was working in the Garland County Detention Center at the time of the incident. She now is employed by the Hot Spring County Detention Center. Rowe was a Sargent in the jail division, and was trained in a jail standards course as shown by Defendants' exhibit thirteen. Rowe stated she worked in Garland County for approximately eleven years, and had McMurray and Steed as supervisors.

Rowe knew Easter was an inmate at the time he was there in 2008, and knew he had a history of damaging property. On October 11, 2008, she was told that Easter and Hill had broken a lock on a door, and it was requested by Officer Rima that Easter and Hill be moved to 1B, the so-called "bad boy block." Rowe confirmed the move, but not on the consideration of race. The confirmation was only due to the destruction of county property while in 1D.

Rowe stated it "never crossed her mind" that Easter would be beaten up when placed in 1D, and that she would not have agreed if she knew of the issue. Some of the fight was caught on camera in 1B, and she sent an officer to check out what was going on. The officer arrived in about one minute from the beginning of the altercation.

Rowe also directed that Easter and Hill to be placed in holding cell four after the incident. She asked them about medical care, but Hill would not allow her to examine his swollen hand. Easter also would not allow her to examine his injuries. She specifically asked if they wanted to go to the hospital at least twice and the offer was declined each time. Easter stated he was not harmed and did not want medical care.

Rowe also stated other African-American inmates have been placed in 1D without incident.

    E.    Jeremy Hedrick

Jeremy Hedrick ("Hedrick") is currently employed at the Garland County Sheriff's office. He was previously employed at the jail, including during the time in question. As shown in Defendants' exhibit 10, he completed the jail training course in January of 2005.

On the night of the incident at issue, Hedrick was the jailer over the entire facility. He knew Easter had prior incarcerations, but Hedrick had no reason to be concerned for Easter's safety. While incarcerated, Easter was responsible for destroying several items of county property. Rima informed Hedrick that Rima had talked with Rowe and was going to move Hill and Easter into 1B. Hedrick said when there was time, they would move Hill and Easter. About 9:25 p.m. or 9:30p.m., Easter and Hill were moved because of tearing up locks in the cells. Easter and Hill were considered troublemakers.

According to the video, 15 to 20 minutes pass from the time Hill and Easter are placed in 1B

until they beat on the door and tell the officers there has been an altercation. Hill and Easter were then moved to holding.

Officer Tatum was not there when Hill and Easter are placed in 1B. The officers placing Hill and Easter in 1B were Ford, Rima, and Hedrick. Hedrick did not believe Easter or Hill would be placed into a situation where they would be in a physical fight. There was "jail talk" by both Easter and Hill and the inmates already in 1B. Easter and Hill told the officers to put them in 1B so they could "shut the white boys up."

The cell block inmates can see down the hall, if they push on the door and look through what is called the "bean hole." No officer told the inmates in 1B to "beat up" or harm Easter and Hill. Once Easter and Hill were removed from the cell, there were no problems. Hedrick would not have placed them in the cell if he thought there would be issues between the inmates. If he had known, a different approach would have been taken.

Hedrick could not recall how long the white inmates had been in 1B, but other Africa-American inmates had been housed there, as well. Inmates of all races were commonly placed together in a cell at the Garland County Detention Center. There was no ongoing tension or fights among inmates of different races at the time in question. Additionally, Hedrick stated he heard no comments by Hill or Easter that the inmates were white supremacists. If the staff knows of a specific affiliation, a note is made on the booking card for that inmate. There were no such notations for the inmates in 1B at the time in question.

    F.    <u>Shane Tatum</u>

Shane Tatum ("Tatum") is employed in the Garland County Detention Center, and was so employed in October of 2008. Tatum is certified as shown by Defendants' Exhibit 11. This

certification was after the event at issue. At that time, he had worked for the Arkansas Department of Correction and received 500 hours of training. On September 26, 2008, he was hired to Garland County. At the time of the incident he was still considered a new hire, and was walking the jail to observe and learn. He was not making any decisions at the time.

Tatum did not assist in placing Hill and Easter into cellblock 1B, and Easter is mistaken in including him as one of those officers. Tatum was in the booking room when he saw on the monitor there was a problem. Tatum was observing in booking at this time, not working there. Tatum was dispatched when he observed what was going on in 1B. He assisted others in removing Hill and Easter from 1B and taking them away, although he could not recall where Hill and Easter were placed. Tatum had no more relevant contact with Hill or Easter after that point.

After Easter exited 1B, he was still talking and making aggressive gestures. Tatum then placed Easter on the floor and did then threaten to place back in 1B, although Tatum, would not truly place him in there. The treat was an effort to gain control, as Hill and Easter were still in fighting mode and were yelling, cussing, and still fighting. "Jailtalk" was still going on between the inmates.

G. Kenneth Ford

Kenneth Ford ("Ford") works at the Garland County Sheriff's Office as a patrol officer. During the time in question, Ford worked at the Garland County Detention Center.

Earlier in the day of October 11, 2008, Easter was observed "roaming around," despite the fact he was placed on lockdown. Easter had tampered with a lock so that he did not have to remain on lockdown. Later in the evening, Ford saw Hedrick and Rima and was told Easter was to be moved to 1B, due to the tampering with the locks. No other reason for the move was given, and Ford assisted in pulling Easter and Hill out of their cell and taking them over to 1B. Ford had no

-11-

reason to believe or suspect that Easter and Hill would be in an altercation with other inmates.

If Ford had concerns about the move or inmate safety, he would have spoken with his Sargent. It is not unusual for African-American and white inmates to be housed together at Garland County. In fact, segregation would be the exception, rather than the norm.

Ford first became aware there was a problem over radio communication, about the same time Hill and Easter banged on the door to 1B. Easter and Hill are taken out of the cell block, and there is a lot of yelling both ways, including racial slurs. Hill and Easter were very loud and aggressive at that time and were taken to a holding cell. Neither Hill nor Easter requested medical care from Ford, and he had no relevant contact with either inmate after that point.

   H.  <u>Michael Rima</u>

Officer Michael Rima ("Rima") now works for the juvenile court, but he was on duty in the jail on the night of the incident in question. Rima was also one of the deputies who moved Hill and Easter to 1B. Rima heard the prior testimony about why Hill and Easter were moved, and he agreed with that testimony.

Rima further stated that before Hill and Easter were moved to 1B, the booking cards of the inmates in 1B were checked, and there were no notations that would alert the staff to any potential problems, including no notations about keeping those inmates separate from African-American inmates. No reason existed to expect there would be any trouble when Hill and Easter were moved.

Rima also stated he did not tell any inmate in 1B that Easter and Hill would be arriving.

**II.** **<u>Discussion</u>**

   A.  <u>Failure to Protect</u>

The Court notes the records presented at the hearing show that Easter was a convicted

prisoner at the time in question. As Defendants' exhibit one shows Plaintiff was sentenced on July 15, 2008. However, for the legal analysis required herein, the distinction between Plaintiff's status as a pretrial detainee or a convicted person makes little difference.

Due process "'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988)(*quoting Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984)). Similarly, the Eighth Amendment imposes a duty on the part of prison officials to protect convicted prisoners from violence at the hands of other prisoners. *See e.g., Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998).

The conditions of a prisoner's confinement are clearly subject to Eighth Amendment scrutiny. *See, Helling v. McKinney*, 509 U.S. 25, 31-32(1993); *Brown v. Nix*, 33 F.3d 951, 954-955 (8th Cir. 1994); *C.H. v. Sullivan*, 718 F. Supp. 726, 733-734 (D. Minn. 1989), aff'd, 920 F.2d 483 (8th Cir. 1990). Indeed, our Court of Appeals has mandated a "careful judicial scrutiny" of prison conditions. *Tyler v. Black*, 865 F.2d 181, 184 (8th Cir. 1989), cert. denied, 490 U.S. 1027(1989). Accordingly, it is well-settled that a prisoner's confinement must not result in a serious deprivation of his basic human needs, or of a minimal, civilized measure of life's necessities. *See, Helling*, 509 U.S. at 32; *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976); *see also, Rhodes v. Chapman*, 452 U.S. 337, 347-348 (1981). As stated, the focus is on "basic human needs-e.g., food, clothing, shelter, medical care and reasonable safety." *Helling* , 509 U.S. at 32, *citing DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199-200(1989); *see also, Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995); *Brown*, 33 F.3d at 955. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)

[internal quotes and citations omitted].

Prison officials violate the Eighth Amendment "only when two requirements are met." *Farmer*, 511 U.S. at 834. First, the alleged deprivation must be, objectively, sufficiently serious, that is, the prison official's act, or failure to act, must have resulted in "the denial of the minimal civilized measure of life's necessities." *Id.*, *citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991), *and Rhodes*, 452 U.S. at 347; *Williams*, 49 F.3d at 445. Second, to be liable, a prison official "must have a sufficiently culpable state of mind," *id.*, *citing Wilson* 501 U.S. at 302-03, and, in cases such as this one, a subjective standard-namely, a "deliberate indifference" to an excessive risk posed to an inmate's health and safety-must be satisfied before a finding of liability can attach. *Id.*; *see also, Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004), cert. denied, 546 U.S. 860 (2005) ("The defendant's conduct must objectively rise to the level of a constitutional violation, by depriving the plaintiff of the minimal civilized measure of life's necessities, [and][t]he defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner.")[internal citations and quotations omitted].

"Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offense against society.'" *Lenz v. Wade*, 490 F.3d 991 (8th Cir. 2007), cert. denied, 552 U.S. 998 (2007), *quoting Farmer*, 511 U.S. at 834. Accordingly, "[t]he Eighth Amendment imposes upon prison officials, among other things, the duty to take reasonable measures 'to protect prisoners from violence at the hands of other prisoners.'" *Davis v. Scott*, 94 F.3d 444, 446 (8th Cir. 1996), *quoting Farmer*, 511 U.S. at 833; *see also, Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003) (an Eighth Amendment failure to protect claim requires an inmate to show that there was a substantial risk of serious harm, and that a prison official or officials "knew of and disregarded an excessive risk

to [the inmate's] safety."); *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996)(same); *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002) ("The Supreme Court has made it clear that the Eighth Amendment encompasses an inmate's right to be protected from harm by fellow inmates."), *citing Farmer*, 511 U.S. at 833.

As applicable to this case, the first prong of *Farmer* – that the alleged deprivation must be, objectively, sufficiently serious – is easily met. Plaintiff has alleged Defendants placed him in an open cell on request of the other inmates in that cell, and with indications from those other inmates that due to Plaintiff's race, a physical altercation was imminent.

However, the evidence produced at hearing did not bear out these allegations. The credible evidence showed that Plaintiff was placed in the cell due to his repeated and continuing destruction of county property. The evidence also established the cell was not intended as "all white," but was for those inmates, such as Plaintiff, who exhibited behavioral problems in the facility. Additionally, the evidence also showed there was "jail talk" both ways, between Plaintiff and the other inmates, not just the other inmates clamoring for Plaintiff to be brought into the cell. Thus, no credible evidence established that Plaintiff was placed in the cell by the guards for the purpose of being physically assaulted by other inmates.

Such analysis brings the Court to the next consideration under *Farmer*, the culpable state of mind. There was no evidence that a prison official or officials "knew of and disregarded an excessive risk" to Plaintiff's safety. The evidence established that the inmates in 1B knew Plaintiff was coming into the cell because they could see him down the hallway as he approached; there was no evidence those inmates were previously aware of Plaintiff's arrival to 1B.

Plaintiff had not asked that he be placed in a separate cell due to fear of the inmates, nor were

there any restrictions on the inmates being placed together. A review of the "jail cards" provided after the hearing show that while the Detention Center did make notations that certain inmates should be segregated from other inmates, none of those notes refer to race or appear to be based upon race. Additionally, the jail cards provide no information which would indicate affiliation with a white supremacist or other group which could alert the Defendants to potential harm by placing Plaintiff in 1B.

Plaintiff himself stated he was "surprised" when the other inmates came into his cell and began the altercation. He also stated he had begun a card game with his cellmate upon arrival to the cell. Such factors demonstrate that Plaintiff was not in fear of his safety, and no evidence was produced to establish that the Defendants knew, or should have known, that Plaintiff would be harmed by the inmates in 1B. Without such knowledge, deliberate indifference can not be established.

B. Denial of Medical Care

Plaintiff has further alleged he was denied medical care after the incident in October of 2008. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a

constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

At the hearing, Plaintiff stated he had some blood draining from his nose, and some scrapes and bruises after the altercation in 1B. Plaintiff described his injuries as "nothing major." He also alleged that he was placed in a holding cell with no medical care until the next shift change. Defendant Rowe stated that she visited with Plaintiff when he was in the holding cell, shortly after the altercation, and specifically asked him on more than one occasion if he wanted to see a doctor or get medical treatment. Rowe stated Plaintiff denied any need for medical care. Plaintiff did not contradict Rowe's statement and agreed she visited with him at the time in question, but stated that he did not pay attention or listen to what she was saying to him. Plaintiff also agreed there are no medical requests sent in for injuries he suffered during the incident.

Thus, the uncontradicted evidence is that medical care was provided to Plaintiff, or at least offered to him. The evidence also showed his injuries were not "serious." Moreover, at most, Plaintiff has stated a delay of medical care occurred after the incident. However, Plaintiff must show he was adversely affected by the delay.

When an inmate alleges a delay in medical treatment constituted a constitutional deprivation, the objective seriousness of the deprivation is also measured by reference to the effect of the delay in treatment. *Coleman v. Rahija*, 114 F.3d at 784 (*citing Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). An inmate who complains that the delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995) (*quoting Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir .1994)).

Plaintiff has come forward with no evidence to support that he was adversely affected by any delay in his receipt of medical care. In fact, Plaintiff has failed to come forward with evidence that his injuries were in any way related to a serious medical condition of which a delay could adversely affect. *Laughlin v. Schriro*, 430 F.3d 927 (8th Cir. 2005) (lack of evidence that delay in arranging treatment of inmate's heart attack had detrimental effect on inmate precluded finding of objectively serious deprivation of medical care). Accordingly, Plaintiff can not establish he was denied medical care or suffered an unconstitutional delay in the receipt of medical care.

### III.    Conclusion

For the reasons stated above, I recommend that judgment be entered in the Defendants' favor and the Complaint, ECF No. 1, be dismissed with prejudice in its entirety.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact.**

**The parties are reminded that objections must be both timely and specific to trigger de**


**novo review by the district court.**

      **DATED this 14th day of December 2010.**

                                /s/ Barry A. Bryant  
                                HON. BARRY A. BRYANT  
                                U.S. MAGISTRATE JUDGE